## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **ROBIN R. GRISWOLD,** | ) | **CASE NO. 4:05CV3173** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court on the denial of disability benefits under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. The Court has carefully considered the record and the parties' briefs (Filing Nos. 11 and 14). For the reasons that follow, the decision of the administrative law judge is reversed and remanded for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff Robin Griswold filed an application for disability benefits under Title II and Title XVI of the Act on October 10, 2002. (Tr. 57-59, 371–373). The claims were denied initially and on reconsideration. (Tr. 38–42, 46-50, 375–379, 381–385). Following the hearing held on September 22, 2004, Administrative Law Judge Theodore T. N. Slocum (hereafter "ALJ") determined that Griswold was not under a "disability" as defined in the Act. (Tr. 14–27). On May 13, 2005, the Appeals Council of the Social Security Administration denied plaintiff's request for review. (Tr. 8–11) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

Griswold claims that the ALJ's decision was not supported by substantial evidence in four specific instances. First, Griswold claims that the ALJ failed properly to determine

her residual functional capacity ("RFC") because the ALJ ignored some of the limitations identified by Griswold's treating physician, Tamara Johnson, M.D., and ignored some of the limitations identified in the functional capacities evaluation report prepared by a state agency physician.  Griswold contends that the ALJ failed to assign controlling weight, or alternatively, the greatest weight, to Dr. Johnson's opinions.  Griswold also contends that the ALJ did not properly apply the factors for judging a plaintiff's subjective complaints as identified in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  Relatedly, Griswold contends that the ALJ erred by posing an improper hypothetical question to the vocational expert ("VE") that omitted some of her physical limitations.

Upon careful review of the record, the parties' briefs, and the law, the Court concludes that the ALJ's decision denying benefits is not supported by substantial evidence in the record as a whole.  Therefore, the Court reverses the Commissioner's decision and remands the case for proceedings consistent with this decision.

## FACTUAL BACKGROUND

Griswold was under the care of primary physician J.M. Hermsen, M.D., in Beatrice, Nebraska, in 1983 when she delivered her only child, in the mid 1980's. Following a complete hysterectomy in 1986 at approximately age 24, Robin Griswold was prescribed estrogen replacement therapy (Premarin and later Ogen), and thereafter, she began experiencing migraine, cluster, vascular and muscle tension headaches. (Tr. 218).  She was also examined and treated by neurologists David L. Smith, M.D., and Lewiston Birkmann, M.D., in 1987 for headache pain.   Dr. Smith found that Griswold suffered from mixed tension-vascular headaches, that were possible related to her estrogen levels.  (Tr. 217-18).  It appears that between 1987 and the date of the hearing on September 22,

2

2004, with the exception of when she has not been able to afford medical care, Griswold has been under a physician's care for the management of the pain associated with these headaches.   Over the past 15 years, Griswold has been prescribed numerous medicines in an attempt to alleviate her pain.  They, almost universally, have been ineffective.  (Tr. 209-213).  The only pain medications that have brought consistent relief to Griswold are Talacen and Soma, which are controlled substances.

 In 1990, Griswold underwent a pelvic ultrasound which was read by Dr. James P. Schlichtemier.  His findings included "moderate scoliosis of the lower thoracic and upper lumbar spine."  (Tr. 292).

Griswold received treatment from the in the mid 90s from various physicians and physicians' assistants through the Tri County Medical Clinic in Indianola and Cambridge, Nebraska.  Lennie Deaver, M.D., was her primary health care provider as early as 1995 and through 1997.  Dr. Deaver treated her for headache pain from 1995-97, and he noted as early as February 5, 1996, that Griswold "does have significant curvature of the back with convexity to the right."  (Tr. 204).

In January 1998, Tamara Johnson, M.D., became Griswold's primary physician. In Dr. Johnson's first treatment note, she reported that Griswold had been examined by neurologists in Omaha and in Denver.  The neurologists told her that "she has both muscle tension and migraine headaches . . .." (Tr. 200), and Dr. Johnson's clinic records supported that conclusion.  Over the months from approximately May 2000 through April 2001, Dr. Johnson's treatment notes indicate that Griswold was managing her headaches well with Talacen and Soma (Tr. 1997-98).   In October 2001, Griswold telephoned in her request for refills, which Dr. Johnson's physicians' assistant authorized for just one month. Griswold

3

returned to Cambridge for a physical examination by Dr. Johnson in November 2001, at which time Dr. Johnson refilled all her pain medications and suggested a return in 6 months. (Tr. 197).

Griswold and her family moved to New Mexico for a very brief time. In February 2002, Griswold's husband of several years unexpectedly died of a heart attack in New Mexico.  By March, Griswold and her son moved from New Mexico to the Scottsbluff, Nebraska, area to live with her husband's relatives.  On March 11, 2002, Western Nebraska Community College Support Services referred Griswold to the State of Nebraska's Department of Education, Division of Vocational Rehabilitation to assist her in finding employment.  The Division of Vocational Rehabilitation sought an opinion from Griswold's treating physician regarding whether she had any limitations that might affect her employment.

In response, Dr. Johnson, whose Cambridge office was more than 250 miles away from Scottsbluff, faxed a letter to the Division.  In the letter, Dr. Johnson identified Griswold's "chronic medical problems including migraine headaches, cervical and lumbar problems, and hypertension."  In the letter, Dr. Johnson provided employment restrictions, including not lifting more than 20 lbs intermittently; no repetitive lifting exceeding 10 lbs.; standing  no more that 15-30 minutes at a time; and no repetitive arm motions to avoid pain in her spine and recurrence of headaches.  The Division placed Griswold in a telemarketing job starting on April 2, 2002, in Alliance, Nebraska, but in May, she moved to the McCook area to take a job as a cook.  Griswold resigned her cooking position three months later because of pain and numbness in her arms.

4

Beginning in July 2002, Griswold's primary health care provider became Jamie Hatcliff, a physician's assistant at the Gage County Medical Clinic in Beatrice, Nebraska, and Hatcliff has provided care throughout the time between 2002 and the 2004 hearing. (Tr. 130, 177-78).  On October 7, 2002, Griswold presented with right shoulder and neck pain that she reported as similar to pain she had experienced while most recently employed in McCook.  Hatcliff referred Griswold to Daniel Samani, M.D., an orthopaedic surgeon, for evaluation of her right shoulder and neck pain.

Dr. Samani ultimately performed two surgeries on Griswold.  Dr. Samani sent Griswold to neurologist Dr. Birkmann for evaluation, and Dr. Birkmann administered a nerve conduction and EMG studies.  These studies showed 1) a moderately sever right carpal tunnel syndrome,  and 2) a mild left carpal tunnel syndrome.  On examination, Dr. Birkmann found localized right shoulder pain that increased with range of motion. (Tr. 214-15).  This was noted by Birkmann as an area that might need future attention.  *Id.*  Dr. Samani performed the first surgery, an endoscopic right carpal tunnel release, on Griswold in November 2002.

In the time between the carpal tunnel release and the second surgery,  on January 14, 2003, Griswold participated in a residual functional capacities evaluation performed by a state agency physician as part of her disability application.  The evaluation determined that Griswold had the following abilities and limitations:  to lift 20 pounds occasionally (mainly with the left arm and the right arm only assisting); to lift 10 pounds frequently (primarily with the left arm); to stand, sit and walk 6 hours out of an eight-hour work day; limited in pushing and pulling with the right arm; to occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; to  never climb ladders, ropes or scaffolds; she

5

was limited in reaching in all directions with both arms and limited in handling, fingering and feeling with the right hand; she should avoid a concentrated exposure to vibrations and hazards and machinery due to back pain and headaches; and that she should avoid even a moderate exposure to fumes, odors, dusts, gases and poor ventilation. (Tr. 341–348). A second state agency physician completed a Residual Physical Functional Capacity Assessment form in reconsideration of Griswold's claim and affirmed the prior evaluation as it was written. (Tr. 349).

Griswold complained of shoulder pain even after the carpal tunnel release was performed, and after a period of fruitless physical therapy, an MRI revealed that Griswold had a right shoulder rotator cuff tear. The tear was surgically repaired by Dr. Samani on May 21, 2003. Griswold commenced several months of physical therapy on the right shoulder commencing May 28, 2003, and concluding August 8, 2003. The physical therapy sessions were deemed unsuccessful as Griswold continued to describe significant pain. Interspersed throughout the physical therapist's records are references to Griswold's continuing severe headaches. (*See*, i.e., Tr. 242, 246, 2653-55, 279, 284). The physical therapist noted continuing weakness illustrated by Griswold's ability to perform only ten repetitions of bicep curls using three pound weights. None of the physical therapy goals were attained. (Tr. 236-37). In a July 1, 2003, note, Dr. Samani's treatment plan included weaning Griswold off narcotics, the Talacen and Soma, and consideration of a pain clinic referral.

In July 2003, Dr. Samani referred Griswold to Nebraska Pain Consultants to determine whether any additional treatments could be offered to her for her headache, neck and shoulder pain. At the clinic, Griswold was treated by Liane Donovan, M.D., who

6

noted in her report dated July 18, 2003, that Griswold had throughout the years attempted to find relief from her migraine pain with amitriptyline, Zomig, Topomax, Midrin, Axert, Imitrex, Cafergot, Inderal, Depakote, Percodan, Vicodin, lorazepam, Fiorinal, Darvocet, Maxalt, Toradol and tramadol, in addition to the Talacen and Soma that seemed to give her some relief.  (Tr. 233-235).   The record reflects that Griswold's chronic headaches, regardless of her physicians' characterization of them as migraine, cluster, vascular or muscle tension headaches, have affected her day to day living from 1986 through the date of the hearing in 2004.

     Without the benefit of the pain clinic's final recommendation, Dr. Samani stated in his record of August 12, 2003, that he still "strongly suspect possible dependency issues," but he acknowledged that Griswold had been "compliant with her pain clinic interviews and treatments and will continue doing so."  (Tr. 219).   On August 22, 2003, Dr. Donovan concluded that Griswold's attempts to gain relief from the headache pain through new prescriptions and by occipital nerve blocks had not been successful.   Dr. Donovan recommended, given Griswold's "long history of fighting these pains," that Griswold return to the Talacen and Soma treatment regime for pain relief.  (Tr. 233-231).

     Griswold's medical history also includes a hospitalization in 2000 for abdominal pain and acute renal failure, and during that hospitalization she was diagnosed with diabetes mellitus type II.  Griswold stated during that hospitalization that she had self-administered crushed Talwin (Percodan) intravenously.  At the hearing, Griswold acknowledged that she had used the intravenous drug for a "very short time" in 2000, alternately with Talacen, "right before I found out I was diabetic and didn't really know what was going on."  (Tr. 399).

7

Griswold testified that she completed the 9th grade of formal education, but that she has earned a general equivalency diploma (GED). (Tr. 396–397). She briefly attended grief counseling in 2002 to assist her with her feelings of loss following the unexpected deaths of her husband and her mother in separate events that same year.

### Vocational Expert's Testimony

Gail Leonardt (hereafter the "VE") is the vocational expert who provided testimony in this case. When the ALJ posed the hypothetical question describing the limitations that the ALJ deemed to be credible, the VE testified that a person with the limitations described would be able to perform Griswold's past work as a telephone solicitor, a cashier checker, a screen printer, and an electronics assembler. (Tr. 422-23). When, during cross-examination, the additional limitations to the right hand relating to handling, fingering and feeling, which had been identified by the state agency physician, were added to the hypothetical question, the VE stated that a person with those limitations would not be able to perform Griswold's past relevant work. The VE ultimately determined that a person with those additional limitations might have the ability to be an usher, but that two-thirds of those jobs (184 in Nebraska and 54,524 nationally) did not conform to the limitations of the hypothetical question. (Tr. 426-29).

### ALJ Findings

The ALJ determined that Griswold has performed no substantial and gainful work activity since her alleged onset of disability on December 24, 1999. The ALJ considered Griswold's employment as a cook in 2002, to be a failed attempt to return to work and that it did not constitute substantial and gainful employment. (Tr. 18). The ALJ undertook the

8

familiar five-part analysis[1] in determining whether Griswold is disabled.  Following the five

step analysis set out in 20 C.F.R. §404.1520(a)(4), the ALJ concluded that Griswold's

impairments did not rise to the level of severity required to meet or equal disability status

under the Act, but that she had severe diabetes mellitus, asthma, obesity, a history of

hypertension, hyperlipidemia, muscle tension headaches, scoliosis of the thoracic spine,

and was status post endoscopic right carpal tunnel release and status post right shoulder

rotator cuff repair surgery, which he deemed to be impairments that can cause significant

vocationally relevant limitations.  (Tr. 18).

The ALJ determined that Griswold had the residual functional capacity to lift 10

pounds frequently and 20 pounds occasionally, stand and walk six hours per day, and sit

six hours per day.  She  was precluded from climbing scaffolds, ladders, and ropes.  All

other postural limitations were to be performed on no more than an occasional basis.

Griswold was also precluded from overhead reaching in all directions, bilaterally, and she

must avoid concentrated exposure to vibrations and hazards.  She should avoid even

moderate exposure to noise, fumes, odors, dust, gases and poor ventilation, and her ability

to maintain pace, persistence, and concentration was mildly restricted.  (Tr. 26-27).

Based on this RFC determination, the ALJ determined that Griswold would be able

to perform less than the full range of light work activity.  However, he found at the fourth

step that Griswold was not disabled, because she has the residual functional capacity to

---

[1] "The five part test is as follows: 1) whether the claimant is currently employed; 2) whether the claimant is severely impaired; 3) whether the impairment is, or is comparable to, a listed impairment; 4) whether the claimant can perform past relevant work; and if not, 5) whether the claimant can perform any other kind of work."  *Cox v. Barnhart*, 345 F.3d 606, 608 n. 1 (8th Cir. 2003).

9

perform her past relevant work.  The ALJ found that her pain and other symptoms did not prevent her from returning to her past relevant work as a telephone solicitor, cashier-checker, screen printer, and electronics assembler as she had performed those jobs or as they are usually performed in the national economy.  (Tr. 25).

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo.  Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Harris,* 45 F.3d at 1193.

> "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion."  *Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000). A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record.  *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  That duty may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped.  *Id.*

*Smith v. Barnhart*,  435 F.3d 926, 930 (8th Cir. 2006).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001).  The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Goff v. Barnhart,* 421 F.3d 785, 789 (8th Cir. 2005).  As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a

10

district court would decide the case differently.  *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000).

## DISCUSSION

**"Disability" Defined**

An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B).

**Sequential Evaluation**

In determining disability, the Act follows a sequential evaluation process. 20 C.F.R. §404.1520(a)(4).  In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment meets the criteria of the "listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any

11

other work. *Id.* If a claimant cannot meet the criteria at any step in the evaluation, the process ends and the determination is one of no disability. *Id.*

In this case, the ALJ completed four steps in the evaluation process. Griswold takes exception with the ALJ's RFC determination and his treatment of step four. Specifically, she contends that she can no longer perform her prior relevant work, and that she cannot work at all due to her disabling pain.

**Residual Functional Capacity**

Residual functional capacity ("RFC") is defined as what the claimant "can still do despite . . . limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). RFC is an assessment based on all "relevant evidence," *id.*, including a claimant's description of limitations; observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of her limitations. *Id.* §§ 404.1545(a)-(c), 416.945(a)-(c). *McKinney,* 228 F.3d at 863-64.

**Based on Medical Evidence and Weight to be Accorded**

Griswold contends that the ALJ's determination of her RFC is not supported by substantial evidence because the ALJ's failed properly to consider all of the limitations identified by her treating physician, or in the alternative, all the limitations identified by the state agency doctor who performed the residual functional capacities evaluation. The Court of Appeals for the Eighth Circuit has stated:

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional capacity is a medical question," *Singh,* 222 F.3d at 451. "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000)

12

> (per curiam), must support the determination of the claimant's RFC, and the
> ALJ should obtain medical evidence that addresses the claimant's "ability to
> function in the workplace," *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir.
> 2000).

*Lauer v. Apfel*,  245 F.3d 700, 703-04 (8th Cir. 2001).

Dr. Johnson treated Griswold for several years, and she developed work restrictions that were communicated to the State Division of Vocational Rehabilitation in her March 18, 2002 correspondence.  The restrictions were disregarded by the ALJ.  This year, the Eighth Circuit Court summarized its approach to weighting treating physician medical opinions.

> If a treating source's medical opinion about the nature and severity of the
> claimant's impairments is well-supported by medical evidence and is not
> inconsistent with other substantial evidence in the case, the treating source
> opinion is entitled to controlling weight. § 416.927(d)(2). The regulations
> define "medical opinions" as "statements from physicians and psychologists
> or other acceptable medical sources that reflect judgments about the nature
> and severity of [the claimant's] impairments." § 416.927(a)(2).  "Treating
> source" is defined as the claimant's "own physician, psychologist, or other
> acceptable medical source" who provides the claimant with medical
> treatment or evaluation on an ongoing basis. § 416.902. By definition then,
> the controlling weight afforded to a "treating source" "medical opinion" is
> reserved for the medical opinions of the claimant's own physician,
> psychologist, and other acceptable medical source. . . . See *Shontos v.
> Barnhart*, 328 F.3d 418, 426 (8th Cir.2003) (giving treating source status to
> the group of medical professionals, including therapists and nurse
> practitioners who worked with claimant's psychologist, where the treatment
> center used a team approach); *Benton ex rel. Benton v. Barnhart*, 331 F.3d
> 1030, 1037 (9th Cir.2003) (noting that "the use of a team approach by
> medical providers [wa]s analytically significant" in Shontos 's application of
> the treating source regulations. . . . . *Raney v. Barnhart*, 396 F.3d 1007,
> 1010 (8th Cir.2005) (evaluating therapist's assessment as "other medical
> evidence" rather than as a treating source opinion).

*Tindell v. Barnhart,*  444 F.3d 1002, 1006 (8th Cir. 2006).  An ALJ may discount such opinions if other medical assessments are supported by superior medical evidence, or if

the treating physician has offered an opinion inconsistent with other evidence as a whole. *Id.* at 1013; *Holmstrom,* 270 F.3d at 720.

The ALJ characterized Dr. Johnson's findings as "extreme" and her opinions as "conclusory." (Tr. 21). The ALJ found there were "no clinical findings in her report or other evidence in the record" to support Dr. Johnson's work restrictions. The ALJ found that Dr. Johnson's failure to examine Griswold "suggests that her findings were an accommodation in part by the physician in an attempt to assist the claimant in her disability claim." (Tr. 21).

 The record does not support the ALJ's characterization of Dr. Johnson's opinions, and there is no justification for stripping Dr. Johnson's opinion of all its weight. There is no evidence to support the suspect motivation ascribed to Dr. Johnson by the ALJ. Dr. Johnson's March 18, 2002, opinions were provided in an attempt to return Griswold to the workforce. (*See* Tr. 181-195). The correspondence was prepared months before Griswold filed her application for disability benefits in October 2002. That Dr. Johnson did not perform a physical examination before providing her March 2002 opinions was likely due to Griswold residing and looking for work in the Alliance, Nebraska area, which is at least a few hundred miles from Dr. Johnson's office in the Cambridge, Nebraska area.

I find that Dr. Johnson was Griswold's treating physician from as early as 1999, until 2002. During those several years, Dr. Johnson diagnosed and treated Griswold for cluster/migraine headaches, muscle tension headaches, scoliosis of the dorsal spine, and paraspinous spasm and pain in the cervical and thoracic regions. (Tr. 196-204). In November of 2001, Dr. Johnson examined Griswold because Griswold needed a refill of her pain medications. At the time, Dr. Johnson's reported that Griswold has "chronic migraine headaches" and "a lot of muscle tension headaches as well." (Tr. 196-97). She

14

noted that the headaches had been stable with the medication for a while.  She also noted

that Griswold was obese. During that examination, Dr. Johnson noted "mild paraspinous

muscle spasm up and down the back of the upper thoracic area and in the cervical muscle

area."  (Tr. 197).  Dr. Johnson's assessment included "1. Chronic migraine headaches,

[and] 2.  Cervical muscle spasm and muscle tension headaches." (Tr. 196).

     In the March 2002 correspondence to the State vocational rehabilitation specialist,

Dr. Johnson wrote in part:

> Robin is a 39 year-old female with chronic problems including migraine
> headaches, cervical and lumbar back problems and hypertension.  Because
> of her physical problems, she does have limitations in her work ability.  She
> is not to lift anything more than 20 lbs on an intermittent basis.  She is not to
> do repetitive lifting of 10-lbs or more at all.  Her standing is also limited to no
> more than 15-30 minutes at a time.  She does need frequent breaks to sit
> down and get off her feet.   Repetitive arm motion activities – such as
> mopping vacuuming, hoeing, raking or anything like that   – is also
> contraindicated because of the pain in her spine and recurrence of
> headaches.

(Tr. 194).  If this correspondence were the only record from Dr. Johnson, then the ALJ may

have had reason to disregard it as setting forth only conclusions.  However, there are

several pages of treatment records that precede the March 18, 2002 correspondence.  *See*

*Cox v. Barnhart,* 345 F.3d 606, 609 (8th Cir. 2003).

     I find the limitations identified by Dr. Johnson have support in her medical records,

and in the records of Griswold's other treating and consulting physicians.  Within the record

of her treating physician and other medical records before March 18, 2002, there is a

record of migraine pain, muscle tension headache, spasm of the cervical and thoracic

spine, and scoliosis of the thoracic and lumbar spine, all of which support Dr. Johnson's

restrictions.  (Tr. 196-204, 217-18; 292-340).  After March 18, 2002, it is clear that Griswold

15

continued to treat for unresolved pain in her arm and shoulders, which ultimately required two surgical interventions.  (Tr. 219-230).

In addition, the findings of the state agency physician who completed the RFC evaluation in January 2003 supports many of Dr. Johnson's restrictions.  The state agency physician found that Griswold's "primary limiting conditions are her severe right carpal tunnel syndrome recently status post for endoscopic carpal tunnel release, which she is recovering from, and cervical / thoracic spasm with tension headaches." (Tr. 343).  The state agency physician imposed postural limitations secondary to pain in the back neck and right arm; limited her lifting to mainly with the left arm at 20 pounds occasionally and 10 pounds frequently; limited her from doing any overhead reaching bilaterally.  (Tr. 342-345). These findings and restrictions support the restrictions imposed by Dr. Johnson, with the sole exception of the standing and sitting limitations.

Even though the state agency physician expressly refused to give Dr. Johnson's limitations controlling weight because the report was more than a year old and because it mentioned lumbar pain, the state agency physician determined that Griswold was restricted in reaching all directions in both the left and right, and that Griswold was limited with regard to gross and fine manipulation on the right side, with limitations noted in handling, fingering and feeling.  (Tr. 342-45).  The ALJ disregarded the state agency physician's limitations with regard to gross and fine limitations to the right extremity, and the ALJ did not identify why these opinions of the state agency doctor were disregarded.

Dr. Johnson's restrictions and the state agency physician's restrictions relating to the upper extremities, particularly relating to overhead reaching and repetitive arm

16

movement on the right side are also supported by the subsequent MRI findings of a rotator cuff tear and the subsequent surgical intervention to repair the tear.  (Tr. 219-230).

The ALJ rejected Griswold's headache pain as a significant limitation, even though it is the "first pain" identified by Griswold on the Social Security Administration's Pain Report - Adult. (Tr. 69; 68-75).  The ALJ stated:

> Although the claimant has alleged disabling headaches, no neurological deficits were noted.  Treating source records do not reveal any significant findings related to these complaints, and her symptoms were apparently not considered to be of sufficient severity to require diagnostic tension or referral to any other physician for further exploration of these symptoms.  There is no record of emergency treatment for acute cephalgia.  The medical records do not document evidence of a severe impairment, nor was there any suggestion by any physician that her complaints had resulted in any restriction in her ability to function.

(Tr. 23).  These statements are not supported by substantial evidence in the record as a whole.

There is evidence that Dr. Johnson found the headaches to be a restriction upon her ability to function (Tr. 194, 195-204); there is evidence from neurologists Dr. Smith and Dr. Birkmann that Griswold's headache pain was disabling in 1987 and again in 2002 (Tr. 211-13; 218; 310); there is evidence that her headaches impinged upon her ability to consistently show present for and participate in physical therapy sessions (Tr. 242, 246, 253-33, 257, 284, 286-87); there are medical records demonstrating that she has been treated for migraine headache pain for more than 15 years, from 1987 through 2003, with her first referral to neurologist Dr. Birkmann for headache pain in July 1987 and the most recent in April 2003 (Tr. 297-318; 310 and 211-12); there is evidence that she often presented to emergency rooms for headache pain from April 1987 through July 1988 before she began taking prescriptions to manage the pain (Tr. 173, 297-318); there is

17

evidence that she has tried approximately 20 different prescription medications in an attempt to manage her pain (Tr. 233 for listing); there is evidence that Griswold fully participated in an evaluation at the Nebraska Pain Clinic but that the clinic and its physicians were unable to assist her with a better management of the headache pain (Tr. 231-35); and Griswold herself has described the pain. (Tr. 69-70, 118, 403-04, 409).

Because I find that the ALJ failed to give adequate reasons for rejecting the medical opinions of Dr. Johnson and failed to explore the limitations, if any, posed by Griswold's chronic headaches,  I conclude that this matter must be remanded for further proceeding consistent with this opinion. [2]  *See Smith,* 435 F.3d at 930 -931. (*See also* SSR 96-2p, ALJ must give legitimate reasons for wholly rejecting treating physician medical opinions; and *see Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir. 2000)(quoting 20 C.F.R. § 404.1527(d)(2)).   It may be that additional medical evidence and RFC evaluation will be required to address the effect, if any, of the headaches and Griswold's prescription treatments for them upon her RFC.  The ALJ's duty includes seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped.  *Smith v. Barnhart*, 435 F.3d at 930.

---

[2] Only a year before the ALJ's opinion, however, Griswold was referred to both a pain clinic and physical therapy for assistance. Neither program was successful. The ALJ did not question Griswold's treating physicians or the consultative examiner about the frequency, severity, or controllability of her headaches, despite the 15 year record of debilitating symptomology, and reports by Griswold and her physicians of headaches lasting for several days at one time. The ALJ noted no physician limited Griswold's ability to work due to her headache, but it appears to me that no one was asked to comment on this despite the medical records replete with references to disabling pain, vomiting, and nausea.

18

A review of the objective medical record, including 2003 records from the Nebraska Pain Clinic, reveals that Griswold's headache pain issues are chronic, significant, and have been difficult to manage even with prescription medication.

I also conclude that the ALJ gives no good reason for adopting some, but not all, of the state agency physician's restrictions. The ALJ failed to give any reason for rejecting the portion of the report that limited Griswold's ability to perform fine motor manipulations with her right hand, including handling, fingering and feeling. (Tr. 341–348). The ALJ's rejection of those right hand limitations -- without explanation and in contradiction to Griswold's testimony and other evidence in the record – and the ALJ's silence regarding the failed physical therapy that was attempted after the rotator cuff repair surgery, are additional justification for remanding this matter for further proceedings and additional evidence.

The "ALJ's function is to resolve conflicts among 'the various treating and examining physicians,'" but, in the absence of such a conflict, it is not appropriate for the ALJ to substitute his own opinions for those of the medical professionals. See *Estes v. Barnhart,* 275 F.3d 722, 725 (8th Cir. 2002) (quoting *Bentley v. Shalala,* 52 F.3d 784, 785, 787 (8th Cir. 1985))

### Credibility Determination.

It is well established that a hypothetical question need only include those impairments and limitations found credible by the ALJ. *See Vandenboom v. Barnhart,* 421 F.3d 745, 750 (8th Cir. 2005)*, Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004). Thus,

directly tied to Griswold's argument for reversal is whether the ALJ properly discounted her credibility on the severity of her pain.

Before determining RFC, an ALJ first must evaluate the claimant's credibility. The *Polaski* standard is the guide for credibility determinations. It provides, in relevant part:

> The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. . . . The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986). [3]

---

[3] Social Security Ruling 96-7p provides that a "strong indication" of the credibility of a claimant's statements is the consistency of the claimant's various statements and the consistency between the statements and the other evidence in the record. Ruling 96-7p provides that the ALJ must consider such factors as:

* The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

* The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other

20

20 C.F.R. § 404.1529; *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003). Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony and, in particular, subjective complaints of pain. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, although each factor may not have been discussed); *Anderson,* 344 F.3d at 814.

The ALJ entirely discounted Griswold's testimony. She testified that she continues to get headaches, and described them as follows:

> [T]hey're not just a headache. It's from the shoulders up the neck. Everything tightens. They come on. There's nausea and vomiting with them. They can last two weeks. They're almost daily. They're in different degrees bad enough where I can't do much. Some are where I can't do anything. I have to have help going to the bathroom and stuff.  . . .

---

circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

* The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

SSR 96-7p, 1996 WL 374186 (S.S.A.) at *5 (July 2, 1996).

(Tr. 403-04).   Her testimony regarding her headaches is consistent with her medical records and with her prior statements as set forth above. The severity, frequency and duration of her headaches have been consistently described as being so painful that she cannot function, of occurring one or two times a week, for lasting up to several days at a time, and as being accompanied by nausea and vomiting.  (Tr. 173, 194, 195-204, 211-13, 218, 231-35, 297-318).

In terms of third-party reporting, I note that the Disability Report from Field Office Interviewer Marilyn Stephens states that Griswold's behavior was fully appropriate and that she was fully cooperative and that Griswold carried herself as if in some pain, and that her posture when sitting was as if she was in some pain (Tr. 90).  Unfortunately, the copy of the Supplemental Information Form, which I am guessing was prepared by Griswold's sister-in-law, is largely illegible. (Tr. 104-06).

Though Griswold's headache pain seemed to be well-managed in 2001 with Talene and Soma, there is no evaluation of the effects of these medications, if any, upon her ability to work.   Dr. Samani's concerns about Griswold's dependency on controlled substances to manage her pain were addressed by the referral to the Nebraska Pain Clinic, where Dr. Liane Donovan concluded that a return to Soma and Talacen regime was indicated.

I conclude that the ALJ failed to conduct a proper Polaski analysis supported by the evidence.  The ALJ failed to consider the duration, frequency, and intensity of Griswold's chronic headache, the precipitating and aggravating factors of the pain such as stress and movement, and dosage, effectiveness, and side-effects of medications that she takes for

22

headache pain, and the functional limitations of this headache pain and attendant symptom ology such as nausea and photosensitivity.

I conclude that the ALJ also failed to properly analyze Griswold's subjective complaints of pain relating to her upper extremity following the surgery to repair the right rotator cuff tear. She stated that she went through rehabilitation following the rotator cuff surgery. She described the result of her rehabilitation efforts:

> He said that he couldn't get it to work any better, to seek another opinion, and my arm just doesn't work. I get sharp burning pains in it all the time and I can't lift it above my head, and it hurts to use it period.

(Tr. 402). She stated that her shoulder hurts, and that even after the carpal tunnel release was performed, she still cannot use her right hand very well. (Tr. 402-03.) This testimony is corroborated by the records from her physical therapist and from the Nebraska Pain Clinic. (Tr. 231-276).

Griswold also testified that she has back pain that goes across the top of her shoulders, and that if she stands too long, walks too long, or lifts anything, she experiences pain in her low back. (Tr. 405). She also stated that when she has been standing for too long, her legs begin to cramp, and she conceded that her weight might contribute to that effect. (Tr. 406). She agreed, when asked, that there is no record of her being treated for low back pain, but she recalled treatment for thoracic and neck pain. (Tr. 405). She also stated that she has trouble sitting for long periods because her back and shoulders start hurting. (Tr. 407). She also stated that she cannot sleep well at night because shoulder pain, primarily, and headaches wake her. In a typical night, she gets four or five hours of sleep, and she does not wake refreshed. (Tr. 413). During hours considered regular work

hours, between 8 a.m. and 5 p.m., Griswold estimated that she spends five or six hours either on the couch or in a recliner. (Tr. 415).

The ALJ discounted her credibility finding that her daily activities were incompatible with disabling pain or functional limitation, despite the medical records, the claimant's testimony, and the statement of a third-party to the contrary. The ALJ found a lack of medical documentation of any impairment that would cause extreme pain, evidently ignoring the 15 year-plus history of migraine pain. He also discounted her credibility based on her intravenous Talwin use in 2000, and her failure to report it as drug abuse on a form she completed in 2002, even though the Eighth Circuit Court has observed that the abuse of prescription medication may be consistent with disabling pain. *See Gowell v. Apfel*, 242 F.3d 793, 797 (8th Cir. 2001).

The record demonstrates that the ALJ's attempt to engage in a *Polaski* analysis and to consider the factors set forth in SSR 96-7p in determining that Griswold's subjective pain complaints were not based on substantial evidence in the record as a whole. Accordingly, I find that the credibility determination was not based on substantial evidence, and I will remand for further proceedings consistent with this decision.

### *Question Posed to Vocational Expert*

A vocational expert's hypothetical questions are proper if they sufficiently set out all of the impairments accepted by the ALJ as true, and if the questions likewise exclude impairments that the ALJ has reasonably discredited. *Pearsall,* 274 F.3d at 1220. Because I have concluded that the ALJ improperly analyzed Griswold's subjective complaints of pain relating to her chronic migraine and muscular tension headache pain, and relating to her upper extremity right arm pain, and because I conclude that the ALJ

24

failed to give proper weight to the medical opinions offered in this case, specifically including his failure to adopt the gross and fine motor manipulation restrictions set forth by the state agency physician in the RFC evaluation, I conclude that the hypothetical question posed to the VE is inadequate, and the ALJ's opinions provided in reliance upon the VE's testimony are not supported by substantial evidence.

## Conclusion

I remand in part for further proceedings so the ALJ may further develop the record in order to ascertain what functional limitations, if any, are created by Griswold's chronic, recurring, and severe headaches and the medications that she takes to treat them, and the functional limitations that she possesses in the right and left upper extremity now that she is status post right rotator cuff repair. On remand, the ALJ should, if the evidence warrants, frame a revised hypothetical question to the vocational expert.

I have considered the record, and I conclude that the ALJ's decision should be reversed and the case remanded for additional and further proceedings consistent with this opinion.

IT IS ORDERED that the decision of the Commissioner is reversed, the appeal is granted, and the matter is remanded for further proceedings consistent with this decision.

DATED this 12th day of September, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

25